*6 OPINION OF THE COURT
Jay Stuart Dankberg, J.
Chinese philosopher Lao Tzu in the sixth century B. C. stated that "when armies are mobilized and issues joined, the man who is sorry over the fact will win” (The Way of Lao Tzu, translated by Wing-Tsit Chan).
While the Army mobilization he discussed is obviously different from the voluntary peacetime atomic-powered Armed Forces with which our country defends itself, the issues in this lawsuit have been created due to the continuing military service of respondent Costello (i.e., her being "mobilized” into the Army) and her failure to interpose an answer to this holdover summary proceeding (i.e., the lack of having "issues joined”).
These issues include, but are not limited to, determination of whether individuals who enter military service — be it voluntary or compulsory service — change their place of primary residence. If it does, may such individuals "cure” the breach of tenancy obligation thereby created — would such "cure” ability be due to the language and intent of RPAPL 753 (4), Military Law § 303 (2), some other statute or "public policy” considerations? What is "public policy” in this regard? Should a lawyer be appointed for such persons if they otherwise default in the underlying litigation? If so, who should be such attorney; from where should the name of the legal representative be drawn; who — if anyone — should pay for the attorney’s services?
The court’s research has failed to disclose any reported decision involving the interplay between RPAPL 753 (4), the nonprimary residence statutes and Military Law § 303 (2). Moreover, and even though the Military Law provision was originally enacted over 46 years ago (in 1941), there are almost no reported decisions involving a trial court’s potential obligation to appoint an attorney for a party in military service. Also, in the absence of official rules or guidelines in the Civil Court regarding possible appointment of an attorney for a party (be the party incompetent, indigent or, as here, in the military), research has uncovered no reported decisions indicating how such lawyer is to be selected or paid (in this regard, see, Barbizon Hotel Partnership v Mann, Civ Ct, NY County, Apr. 19, 1982, June 2, 1982, index No. L&T 28079/82).
This, then, is a decision of apparent first impression in several respects.
*7 LAWSUIT
This decision results from a motion by petitioner for an order restoring this proceeding to the Trial Calendar. Upon restoration, petitioner requests an order granting summary judgment in its favor, including issuance of a warrant of eviction.
The underlying summary proceeding is a holdover proceeding based upon petitioner’s claim that respondent Costello has breached various obligations of her tenancy by either subletting and/or assigning her right of occupancy — by maintaining a primary residence other than at the subject premises — by creating a nuisance (these allegations seem to relate to respondent Saan).
It is undisputed that respondent Costello is presently in military service, stationed either somewhere in the San Antonio, Texas, area (her return address on an envelope containing her first correspondence) or at Fort McClellan, Alabama (the letterhead on her second correspondence). Respondent Costello has not been represented in court by an attorney or anyone else.
An attorney represents respondent Saan, the alleged subtenant/assignee.
As soon as the court realized that respondent Costello was in the military service, the file was marked "off calendar and stayed — tenant in military service. Attorney should be appointed (Military Law, § 303).”
Rather than bringing on a motion to have an attorney appointed, after waiting a few months, petitioner has now moved merely to restore the case to the Trial Calendar and for summary judgment.
While the case was marked "off calendar and stayed”, several handwritten letters have been received, seemingly from Ms. Costello.
The court has in hand two of these letters, both written after Ms. Costello apparently spoke to petitioner’s attorney (one is a copy of a letter sent to the lawyer; the other, mailed directly to the court, has been examined by the attorneys for both petitioner and respondent Saan).
From the language used in the second letter (sent to petitioner’s lawyer: "I’m writing this letter as per our phone conversation * * * have not received any rent from Miel Saan * * * I also called her time & time again * * * and told her *8 she would have to move out, I told the Tenant’s Assoc, [petitioner] this and they said they would get her out but did not say at my expense. I do not want my apt. and the Tenant’s Assoc, is aware of this from my last visit home” [emphasis supplied]), it would appear that respondent Costello wishes to surrender rights she might have to possession of the apartment because of difficulties and possible expenses created by respondent Saan. It is not known if Ms. Costello is aware that a prime tenant can have an illegal or improper subtenant removed and, thus, cure any breach of substantial obligation of tenancy thereby caused (see, e.g., N. H. Realty Co. v Dimitriadis, NYLJ, Oct. 22, 1987, at 13, col 3 [App Term, 1st Dept]; Sixty-Nine Realty Co. v McManamon, NYLJ, Mar. 1, 1984, at 11, col 3 [App Term, 1st Dept]; Langham Mansions Co. v Bodine, 117 Misc 2d 925 [App Term, 1st Dept 1983]; RPAPL 753 [4]).
However, the first letter (sent directly to the court: "I am writing this letter after speaking with Linda Ashley [petitioner’s attorney] about my old apt.”) contains language from which is it more difficult, if not impossible, to discern Ms. Costello’s intentions ("I spoke with * * * [the] President of the Tenant’s Assoc. * * * and told her I would still like to keep my apt., but the Tenant’s Assoc, had a vote and decided they didn’t want Miel Saan there any more. Well, anyway I gave up my apt. unless it is possible for me to keep it. Please let me know” [emphasis supplied]).
At best, these are ambiguous letters, containing equivocal language from which the court cannot discern Ms. Costello’s actual intent regarding the apartment. One must also realize there is an inherent possible difficulty presented when a party’s attorney communicates ex parte out of court with an unrepresented adverse party and transfers the communication to the court.
As noted, other than the informal letters, Ms. Costello has not made any appearance in this lawsuit (the letters are not affidavits). Were it not for three statutes, the court would previously have found no difficulty in finding her to be in default and presently provide petitioner with a prudent, provident procedural process to present proof regarding Ms. Costello and Ms. Saan.
These statutes are RPAPL 753 (4), Military Law §§ 303 and 304.
RPAPL 753 (4), enacted in 1982 (L 1982, ch 870), was *9 intended to modify a need for Yellowstone injunctions (First Natl. Stores v Yellowstone Shopping Center, 21 NY2d 630 [1968]), and to give residential tenants one final opportunity, posttrial, to cure a breach of substantial obligation of tenancy and revive a lease.
Military Law §§ 303 and 304, enacted in 1941 (as part of the "New York State Soldiers’ and Sailors’ Civil Relief Act” [L 1941, ch 686, repealed by L 1951, ch 728, § 1, reenacted by L 1951, ch 728, § 2, amended by L 1962, ch 310, § 283, amended by L 1987, ch 693]), were enacted to provide protection to civil litigants in the military service.
STATUTES
Section 303 of the Military Law states, in pertinent portion:
"1. In any action or proceeding in which a person in military service is a party, if such party does not personally appear therein or is not represented by an authorized attorney, the court may appoint an attorney to represent him™ * * * But no attorney appointed under this act to protect a person in military service shall have power to waive any right of the person for whom he[1] is appointed or bind him by his acts.
"2. If any judgment shall be rendered in any action or proceeding against any person in military service during the period of such service, or within thirty days thereafter, and it appear that such person was prejudiced by reason of his military service in making his defense thereto, such judgment may, upon application, made by such person or his legal representative, not later than ninety days after the termination of such service, be opened by the court rendering the same and such defendant or his legal representative let in to defend; provided it is made to appear that the defendant has a meritorious or legal defense to the action or proceeding, or to some part thereof.”
Similar language is to be found in the Federal Soldiers’ and Sailors’ Civil Relief Act (50 USC Appendix § 520).
Also pertinent to this decision, section 304 of the Military Law provides that: "At any stage thereof, any action or proceeding in any court in which a person in military service *10 is involved, either as plaintiff or defendant, during the period of such service or within sixty days thereafter may, in the discretion of the court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his behalf, be stayed as provided in this act, unless, in the opinion of the court, the ability of plaintiff to prosecute the action, or the defendant to conduct his defense, is not materially affected by reason of his military service” (emphasis supplied).
Similar language is to be found in the Federal Soldiers’ and Sailors’ Civil Relief Act of 1940 (50 USC Appendix § 521).
For reasons discussed infra, on this record, this court is unable to find that respondent Costello’s potential ability to conduct her defense is "not materially affected by reason of [her] military service”. In fact, the opposite appears more likely — the lawsuit seems to have resulted by reason of such military service.
APPOINTMENT OF COUNSEL
It has long been recognized that in most civil proceedings, a litigant does not have a right to assigned counsel, even if indigent (Matter of Smiley, 36 NY2d 433 [1975]; Matter of Daley, 123 Misc 2d 139 [Sur Ct, Bronx County 1984]; Matter of Romano, 109 Misc 2d 99, 102 [Sur Ct, Kings County 1981]; cf., Argersinger v Hamlin, 407 US 25 [1972]; Davis v Hanna, 97 AD2d 943, 944 [4th Dept 1983]; Matter of Williams v Williams, 91 AD2d 1044 [2d Dept 1983], and cases cited, at 1045).
It has also long been recognized that a court has the inherent power to assign counsel in a "proper case” (Matter of Smiley, supra, at 438; Matter of Ella B., 30 NY2d 352, 357 [1972] [parental rights]; Matter of Goresen v Gallagher, 108 AD2d 1097 [3d Dept 1985] [indigent civil litigant "who, without assigned counsel, might not have been successful” in obtaining deed]; Davis v Hanna, supra, at 944 [civil litigation involving "a substantial amount of money”]; Matter of Williams v Williams, supra [possibility of incarceration on civil contempt]; Garrow v Garrow, 61 AD2d 887 [4th Dept 1978] [possible jail term for violation of protection order]; Hotel Martha Washington Mgt. Co. v Swinick, 66 Misc 2d 833 [App Term, 1st Dept 1971] [possible eviction]; Matter of Farrell, 127 Misc 2d 350 [Sup Ct, Westchester County 1985] [matrimonial indigent]; CPLR 1102 [a] [indigents]; Family Ct Act § 262 [indigents]; see also, Chase, New York Practice, Assigned Counsel in Civil Cases, NYLJ, July 27, 1982, at 1, col 1).
*11 An attorney has a professional duty to provide uncompensated legal services for the proper litigant, such as an indigent person (Code of Professional Responsibility Canon 2, EC 2-25, 2-29). Does this obligation, for public policy reasons, also extend to those in military service of our Nation?
Without a demonstration that a compelling reason exists for counsel to be excused or that the assignment has become intolerable (Matter of Smiley, supra, at 441), it has been held that the mandated assignment without fee does not violate the lawyer’s constitutional rights (Family Div. Trial Lawyers v Moultrie, 725 F2d 695 [Ct App, DC Cir 1984]; Matter of Farrell, supra).
The reasoning behind such pro bono publico standard is very simple. As Judge Jeffrey H. Gallet’s father understood (Who Loves a Lawyer?, NYLJ, Sept. 24, 1981, at 3, col 1),
"the legal profession and the courts were society’s safety valve. Only lawyers and judges * * * stood between civilization and anarchy; only courts made possible the kind of society in which people settled their differences by peaceful means rather than with knives, fists and guns.
"For that safety valve to remain viable * * * everyone must have access to it; legal representation ought not to be considered a luxury. Our Constitution guarantees the same protection to all, but the concept that we are all equal before the law is mocked if access to the judicial system depends on one’s financial means.”
Such is the abstract theory, lawyer’s "duty” and legal obligation. In real life, however, often it is very difficult to convince an attorney to appear without compensation, pro bono publico (see, e.g., Matter of Farrell, supra).
In this regard, it should be noted that legal organizations created for such purposes (i.e., the Legal Aid Society and the national Legal Services Corporation), in recent years, have faced severe cutbacks in funding. Merely because of the sheer volume of work in the trial courts, and the drain on their limited available funds, these legal service law firms cannot accept every indigent who presently seeks their sage counsel, especially in the "landlord-tenant” arena. This court, in good conscience, cannot add another category — military litigants— to their already ponderous burden.
Is the court, then, to rely on volunteers and assigned unpaid counsel? Should the public treasury pay for such "public good” services?
*12 While it is a lawyer’s duty to provide such free legal services, it must be noted that Matter of Smiley (supra) found that assignment of uncompensated counsel, per CPLR 1102, is "discretionary” authority which should not be too often invoked for it "might * * * be unfair to the Bar to impose such a burden on them” (supra, at 441).
Although the Smiley majority indicated (supra, 36 NY2d, at 337) that courts lacked authority to direct expenditure for assigned civil counsel from public funds (see also, Matter of Goresen v Gallagher, supra), earlier Court of Appeals decisions held that the power to incur legal expenses necessarily implies the power to direct payment for those expenses, especially in fulfilling a constitutional mandate (e.g., Deason v Deason, 32 NY2d 93 [1973]; Glendon v City of New York, 276 NY 329, 332-335 [1938]; see also, Shamon v Lattimore, 115 AD2d 326, 327 [4th Dept 1985], appeal dismissed 67 NY2d 871).
Moreover, language in the 1975 Smiley case (supra), that assigned counsel is constitutionally required only when the State is proceeding against a litigant who has at risk liberty or other "grievous forfeiture” (36 NY2d, supra, at 437), has been made uncertain by the 1981 United States Supreme Court determination in Lassiter v Department of Social Servs. (452 US 18). Under the Lassiter test (452 US, supra, at 25), even if liberty is not at stake, there is only a rebuttable presumption that counsel is not mandatory. Each case must be evaluated, on a case-by-case basis, to determine whether the presumption has been rebutted. To rebut the presumption, a litigant must demonstrate that a vital interest is at stake. If the presumption is rebutted, the Lassiter-defined constitutional directive has been invoked and the court may mandate payment from public funds.
The Lassiter formula is one of due process, derived from Mathews v Eldridge (424 US 319 [1976]), and requiring a balancing of "the private interests at stake, the government’s interest, and the risk that the procedures used will lead to erroneous decisions” (Lassiter v Department of Social Servs., supra, at 27).
Certainly, even in the Smiley decision, then Chief Judge Breitel recognized that one’s right to a home involves a vital private interest. Perhaps in keen foresight of the many homeless indigents who dwell on the streets of our Nation, he said that there are various "kinds of private litigation which may *13 drastically affect indigent litigants * * * Eviction from homes, revocation of licenses affecting one’s livelihood, mortgage foreclosures, repossession of important assets purchased on credit, and any litigation which may result in the garnishment of income may be significant and ruinous for an otherwise indigent litigant” (Matter of Smiley, supra, at 440-441 [emphasis added]).
What are the mechanics a court must follow in order to properly appoint counsel — paid, volunteer or assigned — and yet "not too often invoke” such assignment upon a limited portion of the Bar? If this court were to appoint such counsel, would it be proper for a different Judge to determine if a fee is proper (or in what amount and paid from what source), to hear the underlying case, or (since there is a basic familiarity with the facts possessed by this court), should not some other Judge in an impartial manner determine from what register counsel should be appointed (i.e., from a "volunteer” list or a random involuntary assignment selected from the Bar in general)?
If this were the Supreme Court of New York or the United States District Courts for New York, these questions would not be unanswered. As discussed in the article by Oscar G. Chase (New York Practice, Assigned Counsel in Civil Cases, op. cit., at 2, col 4), "a formalizing of the assignment process, through court-approved panels” has taken place in those courts (see, articles in NYLJ, Nov. 11, 1982, at 1, col 4; July 29, 1982, at 1, col 2 [SD NY]; May 17, 1982, at 1, col 2; Mar. 17, 1982, at 1, col 2 [ED NY]; see also, NYLJ, Dec. 14, 1979, at 3, col 2 [Am Bar Assn Pro Bono Activation Project]).
However, no such panel, rules or guidelines presently exist in the Civil Court.
Furthermore, while this court feels it necessary for an attorney to be appointed for Ms. Costello (to communicate with the court and thus protect her vital private interest in avoiding being evicted while in the military and to avoid any risk that, without appointment, procedures may be followed that might lead to an erroneous decision), this court should not do the appointing and also hear the underlying case.
By authorizing the sua sponte appointment of an attorney for a civil litigant (a too-rare statute in this regard), the Military Law recognizes that the court may not represent or seek out the interests of the military civil litigant. Nor, in the *14 context of this summary proceeding, should the attorney for either petitioner or respondent Saan perform this function. The possible conflict of interest between Ms. Costello and Ms. Saan — if both ultimately decide they wish to reside in the apartment — is obvious.
In addition, in view of the potential ability of Ms. Costello to "cure” any improper subletting that may have occurred (RPAPL 753 [4]) and to possibly, even posteviction, claim prejudice and an equitable defense by reason of her military service regarding petitioner’s claim that she maintains her primary residence "elsewhere” (Military Law § 303 [2]),[2] much potential conflict of interest between Ms. Costello and petitioner (and, thus, its attorney) is disclosed.
Certainly, an attorney’s services are required here:
— a legal representative would be an independent person who could communicate candidly with respondent Costello and indicate her true freely chosen intent with respect to the apartment;
— a legal representative would be counselor-at-law for Ms. Costello;
— a legal representative would be an advocate for Ms. Costello’s interests (and even aid in potential settlement of this lawsuit);
— a legal representative would be able to call witnesses, subpoena documents, and enable any hearing that might take place to be a full and complete "search for truth”;
— a legal representative would be able to prosecute an appeal from any possible adverse rulings;
— a legal representative would be able to meander successfully through the labyrinth of legalisms and forms that presently surround one’s ability to effect a proper Real Property Law § 226-b subletting and/or a RPAPL 753 (4) stay of eviction to cure a found breach of substantial obligation of tenancy; and
— a legal representative could uncover factual details concerning whether Ms. Costello has or has not changed her place of primary residence.
PRIMARY RESIDENCE
The essential underlying question now arises of whether *15 individuals who enter military service — voluntary or compulsory — change their place of primary residence.
Are not such persons similar to students (530 Second Ave. Co. v Gold, NYLJ, June 28, 1985, at 12, col 1 [App Term, 1st Dept]); professionals in such "itinerant occupations” as singers/voice teachers (Coronet Props. Co. v Brychova, 122 Misc 2d 212, 214, affd 126 Misc 2d 946 [App Term, 1st Dept 1984]); and some nursing home occupants (e.g., Heller v Joy, NYLJ, Feb. 22, 1984, at 6, col 1 [Sup Ct, NY County]; see also, 65 Cent. Park W. v Greenwald, 127 Misc 2d 547 [Civ Ct, NY County 1985]; cf., Matter of L.J.M. Ventura No. 1 v Joy, 105 Misc 2d 291 [Sup Ct, NY County 1980])? Such individuals have been determined to have not changed their place of primary residence even though they do not occupy their subject dwelling unit for at least half a year.
Advertisements on radio and television try to entice the Nation’s youth to voluntarily enlist in the Armed Forces. Those advertisements for the Army ask us to "be all that you can be — find your future in the Army”. Surely, the "future” spoken of does not encompass an eviction from one’s home on the ground of nonprimary residence. If you are to "be all that you can be”, certainly this phrase does not include the concept of being unwillingly evicted from your home. Thoughts of possible eviction do not seem to be within the best interest — or of keeping a high morale — of those in military service of our country.
However, even if it were held that military service can change a place of primary residence, can such breach of tenancy obligation be "cured”?
In this domain, the court is aware of several recent Appellate Term decisions that have held that a lack of primary residence cannot be "cured” — especially upon a demonstration that the prime tenant was engaged in illegal rent "gouging” or "profiteering”, a situation not presented in the instant proceeding (see, e.g., 125 E. 31st St. Realty Co. v Watts, NYLJ, Nov. 27, 1987, at 14, col 1 [App Term, 1st Dept]; Continental Towers Ltd. Partnership v Freuman, 128 Misc 2d 680 [App Term, 1st Dept 1985]; Lufkin v Drago, 126 Misc 2d 177 [Civ Ct, NY County 1984], affd 129 Misc 2d 1108 [App Term, 1st Dept 1985]).
However, it must also be recalled that specific language in the Appellate Division, First Department, decision of Kanter v East 62nd St. Assocs. (111 AD2d 26 [1985]) indicates that a *16 RPAPL 753 (4) cure is possible, even in a primary residence situation. Moreover, when one adds in the fact that military requirements may have resulted in a change of abode, if the person in the military has a present good-faith intent to return, do not considerations of sound public policy require us to give proper deference to those in the military?
One final consideration in determining the potential ultimate ability of petitioner to obtain the subject apartment is the language of Military Law § 303 (2) (quoted supra). Can such application be made — in good faith — months or even years posteviction on a claim that Ms. Costello was prejudiced in her defense — could she not claim that by reason of her military service she was prevented from living in the subject apartment in the first place and was required to sublet it in order to financially maintain her home — would any possible determination be affected by her proven prior knowledge or lack of knowledge of the underlying lawsuit and of her possible recently enacted statutory defenses or ability to "cure” (some "older” cases in this regard — pre-RPAPL 753 [4] and pre-RPL 226-b — include Matter of Title Guar. & Trust Co. v Duffy, 267 App Div 444 [1st Dept 1944], and King v King, 193 Misc 750 [Sup Ct, NY County 1948])? Especially in the absence of a legal representative to safeguard her rights, if any, a judgment rendered by default under such circumstances may be subject to very strong attack. After all, if it is determined that a military litigant does not change primary residence, the petitioner here is basically objecting only to the alleged subtenant and her alleged activities (which petitioner claims constitutes "nuisance”). If an attorney representing Ms. Costello legally sees to it that the "nuisance” subtenant is removed (if such grounds exist), could not such lawyer apply for permission — per RPL 226-b — to legally sublet to a proper subtenant? Would not the problems in this litigation be resolved without the eviction of Ms. Costello? However, it should be noted that such potential issues are merely lightly raised in this decision — they are neither discussed in depth nor attempted to be resolved herein.
CONCLUSION
Military Law § 303 establishes procedure to protect a person in military service against the consequences of a default judgment. Pursuant to subdivision (2), a court has discretion to appoint an attorney to represent and protect the interests of the absent military litigant especially where, as here, a *17 potential grievous forfeiture of a vital private interest is at stake or procedures may be followed that might lead to an erroneous decision (here, eviction where there is the possibility of a "cure” of any breach of tenancy).
In 1943, it was stated that Military Law § 303 "gives the court a right, and it is its duty upon application, to appoint an attorney to represent and protect the interest of a defendant who is in the military service or one who may be in the military service but cannot be found, before judgment can be entered” (Syracuse Sav. Bank v Brown, 181 Misc 999, 1002 [Sup Ct, Onondaga County]).
From the above statements, it is clear that this court chooses to exercise whatever discretion it has in directing appointment of an attorney for the litigant in military service. Indeed, it is held that such appointment is mandated by public policy considerations and is also constitutionally required due to the potential grievous forfeiture of a vital private interest of one in the military service of our country— the rebuttable Lassiter presumption (Lassiter v Department of Social Servs., 452 US 18, supra) has been rebutted under the facts of this case (Matter of Smiley, 36 NY2d 433, supra), thereby mandating appointment of counsel.
In her supporting papers submitted with the instant motion, petitioner’s attorney states that this court was "considering appointing an attorney to represent the interests of Ms. Costello whereupon this proceeding was marked 'off calendar’.” As of the making of the motion "no notice of appointment nor communication by the Judge has been received”.
Such statements are mostly accurate. No notice of appointment nor communication from this court has been sent. Ex parte communication would be improper — research was being done — the Legislature was amending Military Law § 303 — no Civil Court procedure existed regarding appointment of counsel. However, her statement should not be read (and, thus, is not accurate) that this court was going to do the appointing.
Thus, the file was marked "off calendar and stayed — tenant in military service. Attorney should be appointed (Military Law, § 303)”. Such file marking does not indicate who should do the appointing or in what manner. In fact, for reasons discussed supra, it would be improper for this court to appoint counsel and also hear the underlying case. In the instant motion, movant has not suggested a way around this problem —a solution must be found for this case to proceed.
*18 The submitted papers do not demonstrate that the stay previously directed should be vacated (a ground of relief not directly sought in the moving papers but inherent in the branch of the motion seeking to restore this proceeding to the Trial Calendar). Indeed, the papers presently submitted indicate a more urgent need for counsel than previously was apparent — respondent Costello’s intentions are even less known now than they were prior to the motion and receipt of the letters.
In 1987, the United States has volunteer Armed Forces. These young men and women must have a continuously uplifted morale. Part of that morale is that the civilians "at home” understand and appreciate what sacrifices those in the Armed Services make every day.
Heed well the words spoken by Douglas MacArthur in 1933 (Ann Report of the Chief of Staff, US Army, for the Fiscal Year Ending June 30, 1933): "The unfailing formula for production of morale is patriotism, self-respect, discipline, and self-confidence within a military unit, joined with fair treatment and merited appreciation from without * * * Though it can survive and develop in adversity that comes as an inescapable incident of service, it will quickly wither and die if soldiers come to believe themselves the victims of indifference or injustice on the part of their government”.
Appointment of counsel under the facts of this case can enable those in military service to continue to believe that they are to be treated fairly and with justice, even in their "civilian” activities.
The motion for an order restoring this case to the Trial Calendar and for summary judgment is stayed (Military Law § 304; see also, CPLR 3212 [f|). Pending appointment of counsel, the proceeding should remain on the Civil Court’s Military Calendar.
Settle order.
Since the Civil Court lacks present procedure or panels regarding appointment of a legal representative, the order to be settled should propose a legally proper mechanism for such appointment (perhaps through the office and with the aid of the Clerk of Special Term, Part II; or the office of the Judge Advocate General of the base at which respondent Costello is presently assigned and the New York Judge Advocate’s office; *19 or the Association of the Bar of the City of New York, the New York County Lawyers Association or similar organized Bar Associations). Notice of settlement of the proposed order should be given to both Judge Advocate General offices and the Commanding Officer of the base at which respondent Costello is currently assigned.

. Although the statute refers to "him” and "he”, it is obvious that the words are a generic description. Women were serving in the Armed Forces and were lawyers in 1941 and, thus, the statute applies to both men and (as in the instant case) women.

. It is well known that military personnel are often required to change their place of temporary domicile. Their children have even acquired the nickname of "army brats”.